**UNITED STATES of America, Plaintiff,**

v.

**Nicholas A. ALFANO, Lisa Marie Alfano, and Long Island Savings Bank, Defendants.**

No. 96–CV–4372(JS).

United States District Court, E.D. New York.

Jan. 25, 1999.

**830**

Philip J. Berkowitz, United States Department of Justice Tax Division, Washington, DC, for plaintiff.

Robert S. Arbeit, Pinks & Arbeit, Hauppauge, NY, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court are cross-motions for summary judgment in this action brought pursuant to Title 26, United States Code, Sections 7401 and 7403, by the United States of America (hereinafter the "Government" or "Plaintiff"), with the authorization and sanction of the District Counsel of the Internal Revenue Service and the Attorney General of the United States. Plaintiff seeks to foreclose federal tax liens upon certain real property that was conveyed to Nicholas A. Alfano and Lisa Alfano (the "Defendants") by their parents, Nicholas J. Alfano and Rita Alfano (the "parents").

## FACTUAL BACKGROUND

Defendants are the current record owners of the residence at 11 Alden Lane, Centereach, New York, where Defendant, Lisa Alfano, presently resides, the subject property at issue (hereinafter the "property"). Plaintiff is seeking to satisfy tax liens against the Defendants' parents through foreclosure sale of the property.

### 1. The Tax Deficiencies

In tax years 1980 and 1981, Nicholas J. Alfano and Rita Alfano each filed federal income tax returns reporting no taxable income. (Pl.'s Statement of Material Facts (hereinafter "56.1") ¶¶ 1, 2.) Nicholas J. Alfano claimed to be exempt from federal income taxes due to the vow of poverty he took as a member of the "Life Science Church" (the "Church"). (Pl's 56.1 ¶¶ 2, 4.) He filed a federal Form 1040A with the Internal Revenue Service ("IRS") in 1980 reporting earnings of $28,639.41 in wages, but owing no federal income taxes. (Pl's 56.1 ¶ 5.) Nicholas demanded a refund of federal income taxes withheld from his wages in the amount of $1,352 .24. (Pl's 56.1 ¶ 5.)

Upon audit, it was determined that each parent owed federal income taxes for tax years 1980 and 1981. (Pl's 56.1 ¶ 3.) After the IRS sent Nicholas Alfano a Notice of Deficiency for income taxes due for tax year 1980, Alfano filed a petition on or about June 7, 1982, for a redetermination of the deficiency with the United States Tax Court (the "Tax Court"). (Pl's 56.1 ¶¶ 6, 8.) On May 28, 1986, the Tax Court decided that a tax deficiency existed for Nicholas J. Alfano's 1980 federal income tax, and the following day, in a similar manner, the Tax Court decided against Rita Alfano, and ordered the payment of the Alfanos' taxes along with penalties and interest. (Pl's 56.1 ¶ 9 & Ex. K.)

The IRS made final assessments against Nicholas J. Alfano and Rita Alfano for unpaid federal income taxes for calendar year 1981 on September 2, 1986 and September 10, 1986, respectively, and for calendar year 1980 on October 14, 1986. (Pl's 56.1 ¶ 10.) The Defendants contend that on October 6 and October 14, 1986, assessments were made against Nicholas J. Alfano for tax deficiencies and statutory additions for the tax years 1981 and 1980 respectively. Further, Defendants contend that assessments were made against Rita Alfano on September 10, 1986, for the 1981 tax year. (Arbeit Affidavit in Support of Summary Judgment (hereinafter "Arbeit Aff. 1") ¶ 7.) These chronological dis-

crepancies are not material to resolution of the instant cross-motions. Notice of Federal Tax Liens were filed with the Suffolk County Clerk's Office on or about December 18, 1987. (Arbeit Aff. 1 ¶ 8.)

## 2. The Conveyance

During the intervening years, and specifically on October 17, 1983, the parents transferred the property to the Defendants. (Pl.'s 56.1 ¶ 14.) The conveyance was made without the passage of fair consideration, in fact, it is undisputed that the conveyance was made for zero consideration. (Pl.'s 56.1 ¶ 15.) Moreover, the Defendants did not legally assume the property's mortgage, however, they agreed to make the payments. (Pl.'s 56.1 ¶ 15E.)

Plaintiff avers that this conveyance effectively caused the parents to become insolvent. (Pl.'s 56.1 ¶ 18.) Specifically, the parents admitted that they had no assets to offset their liabilities. (Pl.'s 56.1 ¶ 18C.) It is further asserted by the Government that the parents primarily continued to live at the property and continued to deduct the home mortgage interest and real estate taxes on their joint 1984 and 1985 federal income tax returns. (Pl.'s 56. 1 ¶¶ 15–17.) The Alfanos did testify that the payment by the parents of the mortgage and taxes was effectively in lieu of a direct rent payment for occupying the property. (Pl.'s 56.1 ¶¶ 15–17.)

## 3. The Bankruptcy Proceeding

On or about January 30, 1991, the parents filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court, Eastern District of New York, under Case Number 091–70163–511. (Arbeit Aff. 1 ¶ 9.) Plaintiff filed a secured claim against the parents asserting an aggregate secured claim in the sum of $53,015.33. (Arbeit Aff. 1 ¶ 10.) Thereafter, the parents moved to reclassify Plaintiff's claim from secured to unsecured. (Arbeit Aff. 1 ¶ 11.) Plaintiff agreed to reduce its secured claim to the sum of $2,000.00, and the balance was reclassified as unsecured, as approved in an Order rendered by United States Bankruptcy Judge Cyganowski, on or about May 9, 1994. (Arbeit Aff. 1 ¶¶ 11, 12.) On December 21, 1994,

Judge Cyganowski entered an Order confirming the Chapter 13 plan (hereinafter "Confirmation Order") and discharging Debtors Nicholas and Rita Alfano from "all debts provided for by the plan or disallowed under 11 U.S.C. § 502," except debts irrelevant herein. (Arbeit Aff. 1 Ex. F.) Plaintiff did not appeal either Order of Judge Cyganowski, although the Government was aware of the prior transfer of the property. (Defs.' 56.1 ¶¶ 9, 10.) Because of this discharge, the Defendants submit that the parents were dropped as party defendants to the instant action. (Arbeit Aff. 1 ¶ 14.)

## DISCUSSION

## I. STANDARDS FOR GRANTING SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)).

A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank*

*v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo,* 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)). It is within this framework that the Court addresses the present cross-motions for summary judgment motion.

Defendants move for summary judgment and oppose Plaintiff's motion for summary judgment on the sole ground that Plaintiff's action is barred by the doctrines of res judicata and collateral estoppel. Plaintiff moves for summary judgment under two separate and distinct theories, a pure fraudulent conveyance theory and a lien theory. If Plaintiff triumphs under either theory of recovery, and the property is sold, the Government recognizes that Defendant Long Island Savings Bank, a creditor with a valid security interest, is entitled to priority over the United States in distribution. (Way Aff. ¶ 2.) Plaintiff opposes Defendants' motion for summary judgment by asserting, in effect, that the parents' discharge in bankruptcy has no legal effect on its right to recover under either theory.

## II. THE DEFENDANTS' SUMMARY JUDGMENT MOTION

■ Defendants specifically contend that by agreeing to reclassify its claim in the parents' Chapter 13 bankruptcy proceeding from secured to unsecured, Plaintiff is barred, more than two years later, from foreclosing on the property. Because the Government acknowledged its awareness of the conveyance, and asserted that the liens attached to the property in 1986, Defendants maintain that Plaintiff must concede that the property was property of the bankruptcy estate, and having agreed to a reclassification of its claim, Plaintiff waived its right to aver that the tax lien continued against the property after the parents' bankruptcy was discharged.

Defendants' blanket reliance upon the doctrine of prior adjudication is unpersuasive and misapprehended. It is true that Second Circuit case law clearly recognizes that proceedings conducted in bankruptcy courts are regularly entitled to preclusive effect on subsequent proceedings with respect to issues already litigated. *In re Bono,* 70 B.R. 339, 342 (Bankr.E.D.N.Y.1987) (holding that "the doctrines of collateral estoppel and res judicata apply with full force to proceedings in bankruptcy courts"); *see also In re Jamesway Corp.,* 205 B.R. 32, 36 (Bankr.S.D.N.Y. 1996) (finding "res judicata dictates that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding"). Further, an order of confirmation binds the debtor and its creditors and has preclusive effect. *See* 11 U.S.C. § 1141(a); *Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991) (res judicata bars any attempt by parties to reorganization hearing to relitigate matters raised or that could have been raised). However, there are statutory and judicially created limitations on the breadth of this preclusive effect.

### 1. Res Judicata

■ According to prevailing Second Circuit case law, once a final judgment has been entered on the merits of a case, " 'it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' " *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2nd Cir.1997) (quoting *Securities and Exch. Comm'n v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1463 (2d Cir.1996) (citations omitted)). Yet, res judicata may "be invoked only after careful inquiry" because, it "shields the fraud and the cheat as well as the honest person." *Brown v. Felsen,* 442 U.S. 127, 132, 99 S.Ct. 2205, 2210, 60 L.Ed.2d 767 (1979) (allowing creditor to assert fraud in bankruptcy proceeding as challenge to dischargeability of prior state court judgment).

■ "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Corbett v. MacDonald Moving Services, Inc.*, 124 F.3d 82, 87–88 (2d Cir.1997) (citing *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir.1985)). The court went on to add that "[i]n the bankruptcy context, we ask as well whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." *Id.* (quoting *Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 875–76 (2d Cir. 1991)). This last inquiry, the court noted, "may also be viewed as an aspect of the test for identity of the causes of action." *Id.*

As discussed *supra*, bankruptcy courts are courts of competent jurisdiction which render final judgments on the merits, and the Confirmation Order was a final judgment adjudicating the parents, bankruptcy petition. However, because it cannot be gainsaid that Defendants were not parties to the bankruptcy proceeding,[1] the first issue that arises is whether the Defendants were in privity with their parents as it pertains to the Chapter 13 bankruptcy proceeding. "The New York Court of Appeals has stated that privity 'includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action.' " *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir.1997) (quoting *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 277, 317 N.Y.S.2d 315, 320 (1970)). " 'Privity has also been found where a person so controlled the conduct of the prior litigation in which they were interested such that the result is res judicata against them.' " *Id.* at 126–27 (quoting *Tamily v. General Contracting Corp.*, 210 A.D.2d 564, 566, 620 N.Y.S.2d 506, 509 (3d Dep't 1994) (citations omitted)).

■ As an initial consideration, the party asserting res judicata has the burden of establishing privity with the parties to the prior adjudication. Defendants have not addressed this issue and have therefore failed to meet their burden on this initial threshold question. Nonetheless, it is quite unlikely that the facts would support a finding a privity. Although the Defendants and their parents have a familial relationship, that alone will not automatically suffice to establish privity. *See Ferris*, 118 F.3d at 127 n. 6 (and cases cited therein). Further, though it could be alleged that Defendants are successors in interest to the property at issue, and thus have the requisite privity, such a conclusion would ignore the specific factual setting. The conveyance occurred prior to the IRS assessment of tax liability and because the property was not considered an asset of the parents' bankruptcy estate—the discharge of which was the determination central to the prior adjudication—the Defendants cannot allege privity as successors in interest. Nor were the Defendants' interests necessarily represented by the parents in the Chapter 13 bankruptcy proceeding, as the IRS did not assert any lien or claim against them at that time.

■ Considering the fourth element, whether the causes of action are the same, Defendants have once again failed to make specific factual or legal assertions to support this required element. This inquiry requires determining whether the second suit involves the same "claim" or "nucleus of operative fact." *Interoceanica*, 107 F.3d at 90 (citing *Apparel Art Int'l, Inc. v. Amertex Enters. Ltd.*, 48 F.3d 576, 583 (1st Cir.1995)). New York courts have adopted the "transactional approach" to res judicata, or claim preclusion, holding that if claims arise out of "the same 'factual grouping,' 'transaction,' or 'series of transactions,' " they are deemed to be part of the same cause of action and the later claim will be barred without regard to whether it is based upon different legal theories or

---

1. The only documents pertaining to the 1991 Chapter 13 proceeding provided to the Court were copies of the United States' Response to Debtors' Motion to Reclassify Claims of IRS and the Order Discharging Debtor After Completion of Chapter 13 Plan. (Exs. D & F of Defs.' Aff. in Support of Summ.J.)

seeks different or additional relief. *Board of Managers of Windridge Condominiums One v. Horn,* 234 A.D.2d 249, 250, 651 N.Y.S.2d 326, 327 (2d Dep't 1996) (citing *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746 (1981)) *see also Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986).

The claims asserted and the underlying transactions are facially dissimilar, yet both stem from the parents' tax liability. The initial action, the Chapter 13 bankruptcy proceeding, resulted in a bankruptcy plan and a subsequent discharge. A Chapter 13 confirmation plan binds the debtors and creditors, and subject to exceptions, vests all property of the estate in the debtor, and the subsequent confirmation order discharges all debts, subject to exceptions. *See* 11 U.S.C. §§ 1327, 1328. The case at bar is brought by the Government to set aside a fraudulent conveyance of the property and to foreclose federal tax liens.

*Corbett* counsels to inquire whether the judgment resulting from the instant motions would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan. *Corbett,* 124 F.3d at 87. As will be discussed *infra,* and as Plaintiff agrees, the parents' personal tax liability was discharged in bankruptcy, and as such, a decision foreclosing on the property will not invalidate or destroy the concluded Chapter 13 proceeding. Further, at the bankruptcy proceeding, neither the debtors nor the creditors claimed or addressed the property as an asset of the bankruptcy estate. Conversely, disposition of the property is central to the instant claim. The evidence and factual issues supporting the Government's fraudulent conveyance claim bear little resemblance to the claims asserted at the bankruptcy proceeding.

Accordingly, because Defendants having failed to support their blanket assertion of res judicata, specifically with respect to the elements of privity and same causes of action, this defense will not lie.

2. Collateral Estoppel

■ Collateral estoppel bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to the judgment. *Central Hudson Gas & Elec. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995); *see also, Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996) (stating that "collateral estoppel has been narrowly tailored to ensure that it applies only where circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness"). Thus the "narrower principle" of collateral estoppel, makes conclusive the determination of an issue in a prior proceeding "in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). "[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 336 n. 23, 99 S.Ct. 645, 654 n. 23, 58 L.Ed.2d 552 (1979).

■ The Second Circuit has enunciated four elements which must be met in order for collateral estoppel to apply: (1) the issues at both proceedings must be identical; (2) the relevant issues were actually litigated and decided in the prior proceeding; (3) there must have been full and fair opportunity for litigation of the issues in the prior proceeding; and (4) the issues were necessary to support a valid and final judgment on the merits. *Central Hudson,* 56 F.3d at 368. In addition, a court must also engage in a fairness analysis to determine "whether controlling facts or legal principles have changed significantly since the [prior] judgment [and] ... whether other special circumstances warrant an exception to the normal rules of preclusion." *Montana,* 440 U.S. at 155, 99 S.Ct. at 974–75. The party seeking the benefit of collateral estoppel bears the burden of establishing the necessary elements. *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990); *In re Sokol,* 113 F.3d 303, 306 (2d Cir.1997).

■ As will become evident *infra*, the determinative issue in this action is whether the parents fraudulently conveyed the property to the Defendants, an issue never decided or raised in the bankruptcy proceeding. Thus, in *Barristers Abstract Corp. v. Caulfield*, 241 A.D.2d 472, 660 N.Y.S.2d 62, 62 (2d Dep't 1997), the court held that neither res judicata nor collateral estoppel barred an action to set aside the transfer of real property as fraudulent where a prior decision in the transferor's bankruptcy case did not resolve the ultimate question of fact, whether the transfer was made with intent to hinder creditors. The Appellate Division so held even though the issue of fraudulent conveyance was raised, but not decided, by the bankruptcy court. *Id.*

Defendants' contention appears to be that the issue decided at the bankruptcy proceeding was the discharge of all debts of the parents' estate. This included all property of the estate including all legal and equitable interests of the debtor in property as of the commencement of the bankruptcy proceeding, which, Defendants assert, must have included their interest in the property at issue, especially in light of the Government's allegation that it attached a lien on the property in 1986. Yet, the specific issue of the legitimacy of the conveyance and whether it was in fact an asset of the bankruptcy estate was never raised or litigated in the bankruptcy proceeding, and therefore, collateral estoppel is inapposite. Moreover, due to the *in rem* lien characteristics and the Second Circuit's holding that pre-petition fraudulent disposition of property is not property of the estate until judicial determination, *see In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir.1992), as discussed within, Defendants' collateral estoppel defense is futile.

However, although articulated as a defense based solely upon collateral estoppel and res judicata, Defendants' legal argument proffered appears to encompass issues of waiver, satisfaction and discharge, and as such, will be considered in the Court's examination of Plaintiff's summary judgment motion.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In support of its motion for summary judgment, Plaintiff asserts a tax lien and a fraud-

ulent conveyance theory. These theories will be addressed seriatim.

It is important to note at this juncture that many, if not all, of the arguments raised by Plaintiff are neither addressed nor challenged by Defendants, and although it is not the Court's role to champion the position of either party, the issues raised are of sufficient juridical importance and personal gravity to warrant thorough analysis. To order the foreclosure of an individual's residence, on what amounts to little more than uncontested papers, and predicated upon someone else's seventeen year old tax liability, gives this Court great pause for concern.

### 1. Was the Action Timely Commenced

■ Although it was not raised in Defendants' papers, and although many courts have been reluctant to consider statutes of limitations issues *sua sponte*, *see Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir.1987), the Court will briefly touch upon the subject. The New York State statute of limitations applicable to fraudulent conveyances does not apply to the United States. The United States acts in its sovereign capacity when it brings suit to set aside a fraudulent conveyance or to enforce a tax lien. When acting in such capacity, the Government is not bound by state statutes of limitations or subject to the defense of laches. *United States v. Summerlin*, 310 U.S. 414, 416–17, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) (holding United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights); *see also United States v. RePass*, 688 F.2d 154, 158 (2d Cir.1982) (finding laches is not available against the United States); *United States v. Podell*, 572 F.2d 31, 35 (2nd Cir.1978) (holding United States is not subject to any statutes of limitation, unless Congress specifically provides otherwise); *United States v. Carney*, 796 F.Supp. 700, 703 (E.D.N.Y.1992) (holding state statute of limitations for New York's Debtor and Creditor Law is not applicable against the government).

Plaintiff is, however, bound by the statute of limitations contained in 26 U.S.C. Section

6502(a)(1), as amended in 1994. This section as amended provides that "[w]here the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun ... (1) within 10 years after the assessment of the tax." 26 U.S.C. § 6502(a)(1). This amended version of 26 U.S.C. § 6502(a)(1) extended the limitations period from 6 years to 10 years, effective November 1990, and it is retroactively applicable to the current action because the assessment against the parents was made in 1986, and the statute was amended before the tax lien would have been discharged in 1992. *See In re Dakota Industries, Inc.,* 131 B.R. 437, 441 (Bankr.D.S.D.1991) (holding that if a tax lien was not discharged by the November 1990 effective date of the amended statute, the amended version would be retroactively applied). Furthermore, 26 U.S.C. § 6901(c)(1) extends the limitations period for the Internal Revenue Service to commence an action to collect outstanding taxes of a transferor through property of a transferee one year beyond the end of the limitations period in 26 U.S.C. § 6502(a)(1).

The Government assessed the federal income tax liability against the parents in September and October of 1986, and initiated this action in September of 1996, within the combined 11–year period under 26 U.S.C. Sections 6502(a)(1) and 6901(c)(1). Therefore, Plaintiff's action was timely commenced.

2. Plaintiff's Standing to Pursue this Action

 The Court also examines the Government's right to commence an action pursuant to a federal tax lien against a party who is not the delinquent taxpayer, notwithstanding Defendant's failure to raise the issue. Plaintiff maintains that its power to pursue this action springs from 26 U.S.C. Sections 7401 and 7403. The government may pursue outstanding tax liens in district courts pursuant to 26 U.S.C. § 7403. Further, 26 U.S.C. § 6331(a) provides in relevant part, "[i]f any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be

lawful for the Secretary to collect such tax ... by levy upon all property and rights to property ... belonging to such person or on which there is a lien provided in this chapter for the payment of such tax." *See In re Jones,* 206 B.R. 614, 617 (Bankr.D.C.1997) (observing that pursuant to § 6331, a tax levy can be made on either property belonging to the taxpayer or on property subject to a tax lien as in the case of property the debtor has conveyed to another before levy has been attempted). Applicable Supreme Court precedent upholds the United States' authority to take action against a transferee of property to collect outstanding tax liens. *United States v. Rodgers,* 461 U.S. 677, 694 n. 18, 103 S.Ct. 2132, 2142 n. 18, 76 L.Ed.2d 236 (1983) (interpreting Section 7403 to reach the entire property in which a delinquent taxpayer has or had any "right, title, or interest"); *see also Kathy B. Enters., Inc. v. United States,* 779 F.2d 1413, 1415 (9th Cir. 1986) (affirming district court's ruling that IRS could proceed against transferee of taxpayer's property prior to taxpayer's discharge in bankruptcy); *United States v. Nicholson,* No. Civ. A. 97–CV–3309, 1998 WL 437267, at *4 (E.D.Pa. July 15, 1998) (holding that "26 U.S.C. § 6901(a) provides a summary administrative procedure for the collection of an existing tax liability from transferees of the taxpayer's property," and this is not the government's exclusive remedy); *United States v. Perrina,* 877 F.Supp. 215, 217 (D.N.J.1994) (stating the "United States as a creditor has the right, like any other creditor, to bring an action either to enforce a lien under 26 U.S.C. § 7403 or against the transferee of a taxpayer for a fraudulent conveyance").

Specifically, the Supreme Court held that Section 7403 does grant the district court the power to order the sale of a property to satisfy an outstanding lien, but "that its exercise is limited to some degree by equitable discretion." *Rodgers,* 461 U.S. at 680, 103 S.Ct. at 2136.

One other statutory provision bears noting. From the bankruptcy laws, 11 U.S.C. § 524(e) provides that the "discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any

other entity for, such debt," also supporting the authority of the Government to proceed against the Defendants notwithstanding the parents' bankruptcy discharge.

Accordingly, Plaintiff has standing to bring this action against Defendants.

### 3. The Tax Lien And The Bankruptcy Proceeding

 It is undisputed that the Government filed a valid tax lien against the parents prior to their entering into bankruptcy protection. It is also uncontested that at the time of the bankruptcy proceeding the Government was aware of the prior conveyance of the property, although it was apparently never mentioned by the parents or the IRS. Plaintiff initially asserted a secured claim against the parents in the full amount of the tax deficiency and later agreed to reduce the secured claim to $2,000.00, the apparent amount of assets in the bankruptcy estate. The bankruptcy plan was confirmed, effectively discharging the debtors of all outstanding debts. Although it seems a natural inclination to conclude that the bankruptcy proceeding therefore discharged the parents' tax liability, the Government asserts two separate legal theories to dispel this reasoning. The lien theory concedes that the parents *in personam* liability to the IRS was discharged in bankruptcy, yet asserts an *in rem* claim against the property.

 The Government cites to *In re Isom*, 901 F.2d 744 (9th Cir.1990) for the proposition that a bankruptcy discharge does not destroy a United States tax lien. This is generally a correct statement of law. The Ninth Circuit specifically held that "26 U.S.C. § 6325(a)(1) does not require the I.R.S. to release valid tax liens when the underlying tax debt is discharged in bankruptcy." *Id.* at 745. To properly analyze its relevance to the instant action requires a more detailed understanding of the applicable tax provisions.

 A tax lien arises from Section 6321 of Title 26 of the United States Code, which provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. This language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) (citations omitted). The lien shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed is satisfied or becomes unenforceable by reason of lapse of time. *See* 26 U.S.C. § 6322; *see also United States v. City of New Britain*, 347 U.S. 81, 84, 74 S.Ct. 367, 369, 98 L.Ed. 520 (1954) (describing lien as choate "when the identity of the lienor, the property subject to the lien, and the amount of the lien are established" and the federal tax lien, as a general lien when attached at the time of assessment to all of the taxpayer's property, was thus perfected). "A federal tax lien becomes a lien on all property of the debtor, so the property need not be described." *In re LMS Holding Co.*, 50 F.3d 1526, 1530 (10th Cir.1995).

A lien is released when "the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or becomes legally unenforceable," and the Secretary shall thereafter within 30 days issue a certificate of release. *See* 26 U.S.C. § 6325(a)(1).

Therefore, the initial issue is whether the Government's acquiescence to the reclassification of its secured claim to an unsecured claim, and Defendants' subsequent discharge in bankruptcy, satisfies the requirement of § 6325. Or stated in another fashion, though *Isom* stands for the proposition that the IRS is not required to release valid tax liens when the underlying tax debt is discharged in bankruptcy, is the same result required when the IRS agrees to a reclassification of its debt from secured to unsecured, prior to discharge.

The first line of cases, representing the vast weight of opinion, espouse the result achieved in *Isom*. A good starting analysis of the issue begins with *In re Leavell*, 124 B.R. 535, 540 (Bankr.S.D.Ill.1991), wherein the court recited the general rule, "[o]nce the taxpayer files for bankruptcy and receives a discharge, he is relieved of personal liability for dischargeable tax debts. The debtor's discharge does not automatically invalidate tax liens securing dischargeable debts, and these liens continue beyond bankruptcy as a charge upon the debtor's property if not disallowed or avoided." *Id.* (citing *In re Leslie*, 103 B.R. 775 (Bankr.S.D.W.Va.1989) & *In re Dillard*, 118 B.R. 89 (Bankr.N.D.Ill. 1990)).

This reasoning was followed by *In re Stephenson*, 96 B.R. 388 (Bankr.S.D.Fla.1988), as the court upheld the federal tax lien recorded against the debtors' homestead prior to their Chapter 7 filing, even though the underlying tax obligation was discharged in bankruptcy. *Id.* at 389 (citing *Verran v. U.S. Treasury Dep't*, 623 F.2d 477, 479 (6th Cir. 1980)) (holding the IRS could collect unpaid tax liability from property owned by debtors prior to their petition in bankruptcy to the extent the government possessed a valid lien upon such property); *see also In re Sills*, 82 F.3d 111, 113 (5th Cir.1996) (affirming validity of IRS tax lien and finding claim that lien is unenforceable to be meritless); *In re Aylward*, 208 B.R. 565 (Bankr.M.D.Fla.1997) (Chapter 11 debtor claimed tax lien was unenforceable, because, in part, it was not perfected as required by the Bankruptcy Code, however, the court looked to the applicable IRS Code in determining that the lien was enforceable and the debtor's discharge only protected personal debt and not property); *In re Doviak*, 161 B.R. 379, 381 (Bankr. E.D.Tex.1993) (disallowing debtor's motion to "strip down" IRS tax lien, in part, because debtor's *in rem* liability survived debtor's bankruptcy discharge and Congress carved out tax liens as an exception to the general lien avoidance provisions of § 522); *In re Cennamo*, 147 B.R. 540, 542 (Bankr.C.D.Ca. 1992) (wherein both parties conceded that the debtor's discharge operated only as a discharge of the *in personam* liability to the IRS and did not eliminate the pre-petition

tax liens, as the IRS retained a legally enforceable *in rem* claim); *In re Hanson*, 132 B.R. 406, 410 (Bankr.E.D.Mo.1991) (holding when the IRS obtained its tax lien, it obtained rights against the debtor's property to secure payment of the underlying tax obligations in addition to the rights the IRS had against the debtors personally, which alone were discharged in bankruptcy); *In re Rench*, 129 B.R. 649, 651 (Bankr.Kan.1991) (concluding that IRS lien is a statutory lien and although the debtors' liabilities for the tax years are dischargeable, the federal tax liens for those years remain enforceable against any assets acquired before the bankruptcy petition was filed); *In re Gerulis*, 56 B.R. 283 (Bankr.D.Minn.1985) (holding debt of debtors to IRS is discharged, while IRS liens are not).

■ The distinction correctly advanced by the Government concerns the extent and nature of the discharge that results from a bankruptcy proceeding. A discharge in bankruptcy "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a *personal liability of the debtor*, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2) (emphasis added). Therefore, "discharge does not affect liability *in rem* and prepetition liens remain enforceable after discharge." *In re Wrenn*, 40 F.3d 1162, 1164 (11th Cir.1994) (citing 3 *Collier on Bankruptcy* ¶ 524.02[1] (Lawrence P. King ed., 15th ed.1994); *Dewsnup v. Timm*, 502 U.S. 410, 418, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992); *Johnson v. Home State Bank*, 501 U.S. 78, 81–83, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991); *Isom*, 901 F.2d at 745; *In re Thomas*, 883 F.2d 991, 997 (11th Cir.1989); *Estate of Lellock v. Prudential Ins. Co.*, 811 F.2d 186, 189 (3d Cir.1987)) *See also In re Harmon*, 101 F.3d 574, 581 (8th Cir.1996) ("No one suggests that the discharge provisions remove a lien from the debtor's property or make a lien unenforceable *in rem*.").

Illustrative is *In re Avola*, in which the court affirmatively answered the question of "whether federal tax liens continue to attach to the debtors' pre-petition property even though the debtors' personal liability for the

taxes have been discharged." No. 9525068, 1997 WL 792534, at *2 (Bkrptcy.D.N.J. July 17, 1997). The court cited *Johnson,* 501 U.S. at 84, 111 S.Ct. at 2154, for the proposition that a "bankruptcy discharge extinguishes only an action against the debtor *in personam* while leaving intact an action *in rem.*" *Id.* Ultimately the court denied debtors' motion to avoid the federal tax liens against their pre-petition property. *Id.* at *3.

Also instructive is *In re Dillard,* wherein the court framed the issue as "whether the IRS must release its tax lien on Plaintiffs' property when the tax obligations which gave rise to that lien are dischargeable in bankruptcy." 118 B.R. at 91. The court analogized a tax lien to a secured creditor's lien and looked to established precedent for the axiom that valid liens that have not been disallowed or avoided survive the discharge of the underlying debt. *See, e.g. In re Lindsey,* 823 F.2d 189 (7th Cir.1987); *Matter of Tarnow,* 749 F.2d 464 (7th Cir.1984); *In re Ryan,* 100 B.R. 411 (Bankr.N.D.Ill.1989).

By obtaining a tax lien, the IRS became a secured creditor under 11 U.S.C. § 506(a). *Dillard,* 118 B.R. at 92. "[T]he IRS's rights against the liened property survive the bankruptcy notwithstanding the fact that the underlying obligations are dischargeable." *Id.* (citing *Lindsey,* 823 F.2d at 191 ("The main purpose served by section 506 is to put the secured creditor who chooses to pursue his rights in bankruptcy in the same position that he would occupy if he had decided to bypass bankruptcy.")).

The court went on to consider whether the obligations discharged in bankruptcy were therefore "legally unenforceable" within 26 U.S.C. § 6325(a)(1). *Id.* at 92. Concurring with the reasoning of *Isom* and its progeny, the court looked to the specific language of 26 U.S.C. § 6325(a)(1) and 11 U.S.C. § 524(a)(2) and explained that

> [t]he language of 11 U.S.C. § 524 specifically speaks of enjoining efforts to collect a debt as a 'personal liability' of the debtor. When the IRS obtained its tax lien it obtained rights against the liened property to secure payment of the tax obligations. Such rights were in addition to the rights it had against [the debtors] personally. As the language of ... § 524(a)(2) and the [precedent] indicate, rights against taxpayers personally are affected by the bankruptcy discharge, but *in rem* lien rights are not. Because a lien holder retains ability to enforce pre-petition dischargeable obligations against the liened property even after bankruptcy discharge, the debtor's obligation survives the discharge to the extent it is secured by the liened property.... Although the lien holder cannot enforce the obligations for unpaid debts personally against the debtor, even following discharge the IRS can pursue its rights against the liened property.... To be truly 'unenforceable' under 26 U.S.C. § 6325(a) means that all of the creditor's remedies to satisfy a prepetition obligation must be extinguished. Since only [the debtors'] personal liability for the tax obligations was extinguished by the bankruptcy discharge, survival of the lien means that the obligation is not wholly 'unenforceable'.

*Id.* at 93.

There seems to be a divergence of opinion as to whether the creditor's action post discharge is necessarily an action *in rem.* For if it is, it would seem logical to require the lien to have identified and/or attached to the specific property at the inception of the lien. This is not a problem in the majority of the cases which often involve creditors as mortgagees. However, as in the case at bar, where the tax lien was not recorded as a lien against the particular property but only against the parents, an action to enforce the lien *in rem* may be inapposite. Of course, this distinction may go more to the definitional use of the term, for "it is true that, in a strict sense, a proceeding *in rem* is one taken directly against property, and has for its object the disposition of property, ... but, in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property owned by them, or of some interest therein." *Black's Law Dictionary* 793 (6th ed.1990).

The court in *Isom* came to a similar conclusion for a different reason. Although the Ninth Circuit affirmed the Ninth Circuit

Bankruptcy Appellate Panel's ("BAP") decision, it rejected the distinction as one between an action *in personam* and an action *in rem*, because although

> this result makes sense in the bankruptcy discharge context, it might not make sense if applied in other contexts. For example, if a taxpayer prevails in a court action against the IRS and is discharged of personal liability, the IRS would not necessarily be required to release the liens under the BAP's reasoning. The better approach is to determine the legal enforceability of the liability by referring to the relevant law affecting the liens. In this case we refer to the bankruptcy code to determine if the liability is legally enforceable.

*Isom*, 901 F.2d at 746 n. 3. Thus the lien prevailed not because it was enforced via an action *in rem*, but because liability for the amount assessed as against the debtor's property survived, notwithstanding the discharge of the debtor's personal liability. *See also Thomas*, 883 F.2d at 997 (section 506(d)(1) "codif[ies] the rule of *Long v. Bullard* —which previously had been purely a judge-made rule of bankruptcy law—permitting liens to pass through bankruptcy unaffected"). It appears that the reasoning in *Isom* is sound, and the better approach is the lien survives as against the property of the debtor.

In addition, the applicable treasury regulation pertaining to release of a lien adds the word "entire" to modify liability so that a lien is released "whenever [the Secretary] finds that the entire liability for the tax has been satisfied or has become unenforceable as a matter of law...." *In re Burns*, 974 F.2d 1064, 1065 (9th Cir.1992) (citing Treas.Reg. § 301.6325–1(a)) (emphasis added).

■ Defendants herein never moved for a release of the IRS lien and never satisfied the methods in which an IRS tax lien can be released: "(1) the tax lien becomes unenforceable by operation of time, (2) the debt which is the basis of the lien is paid in full or (3) an Offer in Compromise is accepted by the IRS which would settle the debt and any tax lien associated with the debt would be no longer enforceable and have to be released." *In re Robert Turner Optical, Inc.*, Bankr.No.

93–01004, 1994 WL 779352, at *4 (Bankr. N.D.Ala. Sept.8, 1994) (upholding validity of federal tax lien).

■ Defendants contend that the Government's action in allowing the debt to be reclassified as unsecured effectively waived its right to collect the balance. However, no evidence has been put forth suggesting that the Government's actions amounted to acceptance of an offer in compromise in settlement of the total tax liability. *See In re Pearson*, 214 B.R. 156, 160–61 (Bankr. N.D.Ohio 1997) (finding IRS' adjustment of proof of claim from secured to unsecured did not constitute settlement requiring removal of underlying lien). There is a marked distinction between a voluntary consensual release and a discharge in bankruptcy. A creditor's acceptance of a reorganization plan is not an "unambiguously manifested assent to the release of the nondebtor from liability on its debt." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr.D.N.J.1997); *see also First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir.1993) ("a bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors"). Apparently, the Defendants did not file an adversary proceeding to suggest any grounds under 11 U.S.C. § 545 for the avoidance of the IRS' statutory lien.

The factual setting and analysis of *In re Deppisch* is also germane to the instant case. 227 B.R. 806, 808–09, 1998 WL 910048, at *3 (Bankr.S.D.Ohio 1998). The IRS filed a tax lien and the taxpayer filed for bankruptcy under Chapter 7. Pursuant thereto, the IRS entered into an "Agreed Order of Dischargeability," yet eight months later it levied the debtor's IRA account. *Id.*, at 807. The court granted the government's summary judgment motion in an action by the debtor for damages for violation of the bankruptcy discharge. *Id.* The court concluded that the debtor's tax liability was transformed into a statutory lien once the tax assessment was made. *Id.* at 808–09, 1998 WL 910048, at *3 (citing *United States v. Carlin*, 948 F.Supp. 271 (S.D.N.Y.1996)). Although the underlying debt was discharged in bankruptcy, it does not render the liability for the amount assessed subject to a valid lien legally unen-

forceable, and therefore, the pre-petition federal tax lien continues in force. *Id.* (citing *Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886) (discharge in bankruptcy did not release a pre-petition lien of a mortgage); *Johnson,* (bankruptcy discharge only extinguishes *in personam* and not *in rem* action against the debtor); *Dewsnup,* (IRS cannot proceed to collect from the debtor personally, it may satisfy the lien by levying against the debtor's property)).

Finally, in *United States v. Uria,* 180 B.R. 688 (S.D.Fla.1995), the district court reversed the ruling of the bankruptcy judge releasing the federal tax liens as unenforceable. The debtors filed separate petitions for bankruptcy and an adversary complaint to determine dischargeability of tax liability. The debtors specifically objected to granting the liens secured claim status and they alleged that pursuant to 11 U.S.C. § 506(d), to the extent the federal tax lien secures a claim that is not an allowed secured claim, it may be avoided. Although the district court judge acknowledged that it was hard to "conceptualize why the federal tax liens should be allowed to survive bankruptcy after the underlying liability is discharged," *id.* at 692, binding precedent and strict statutory interpretation mandated that eventuality. Thus, although the debtors tax liability was discharged, there was evidence of equity to which the federal liens could attach, the equity in the debtors' home, and therefore, the liens were enforceable and survived the discharge. *Id.* at 693.

■ Part of the conceptual difficulty may arise from the interplay between a discharge of the debtor's debt and an extinguishment of the creditor's claim. The key point is that although a debtor's debt may be personally discharged in bankruptcy, the underlying debt is not extinguished. *See In re Conston, Inc.,* 181 B.R. 769, 772 (D.Del.1995) (finding "discharge ... does not cause the underlying debt to vanish" and IRS priority claim may be asserted in a second Chapter 11 case, because, in part, nothing in the bankruptcy code suggest that confirmation of a reorganization plan relieves the IRS from following its collection procedures) (and cases cited therein).

■ Further, Chapter 13 reorganization looks to the confirmation of the plan as the critical point in time. "The basic framework of [reorganization] chapters contemplates the revesting of estate property in reorganized debtors 'free and clear of all claims and interests of creditors, equity security holders, and of the general partners of the debtor,' provided that the property was 'dealt with by the plan.'" *In re Dever,* 164 B.R. 132, 138 (Bankr.C.D.Ca.1994) (citing 11 U.S.C. §§ 1141(c), 1227(c) & 1327(c)). Here, the property at issue was conveyed prior to the filing of the bankruptcy petition and there is no indication that the property was "dealt with by the plan," and therefore is not entitled to protection under the plan.

■ Also relevant is that in the case of a purported fraudulent transfer, the Second Circuit has not included such property when determining the debtor's estate. The court in *Colonial Realty,* 980 F.2d at 130–31, adopted the reasoning of *In re Saunders,* 101 B.R. 303 (Bankr.N.D.Fla.1989) that "[u]ntil a judicial determination has been made that the property was, in fact, fraudulently transferred, it is not property of the [debtor's] estate." *Id.* at 305. Therefore, absent a judicial determination that the property at issue was fraudulently conveyed, it is not properly considered property of the debtor for bankruptcy purposes. *See also Bank Brussels Lambert v. Credit Lyonnais,* 192 B.R. 73 (S.D.N.Y.1996) (finding account receivable not property of debtors' estate based on *Colonial* analysis); *In re Corp. Food Management,* 223 B.R. 635 (Bkrtcy.E.D.N.Y. 1998) (property fraudulently transferred is not property of the estate until judicially determined so); *Klingman v. Levinson,* 158 B.R. 109 (Brtcy.N.D.Ill.1993) (adopting reasoning of *Colonial* and *Saunders* ).

Against this considerable body of precedent, and after an exhaustive search of caselaw, relevant and otherwise, the Court was only able to locate two cases directly supporting Defendants' position. The first case, *In re Smith,* involved the IRS' refusal to remit the debtor's income tax withholding, post-discharge. 35 B.R. 451 (Bankr.N.D.Ga. 1983). The court held that the IRS' claim

was provided for in the debtor's Chapter 13 plan, and upon discharge, the debtor is entitled to have the IRS tax lien canceled. *Id.*

The second case, *In re Campbell*, is procedurally similar to the instant action, also arising under Chapter 13. 160 B.R. 198 (Bankr.M.D.Fla.1993). It is worth recounting the background of *Campbell* as it parallels the case at bar. The government initially filed a claim for unpaid taxes composed primarily of a secured claim. An amended claim was filed changing the composition of the government's claim by reducing the amount initially asserted as secured to reflect the debtor's free assets to which a tax claim could attach. *Id.* at 199. The court entered an order determining the amount of the government's secured claim. *Id.* at 200. After the allowed secured claim was paid in full, the debtors filed a motion and sought an order to compel the government to release the tax lien on the grounds that there was no longer an underlying obligation validly secured by a lien. *Id.* The government failed to appear at the scheduled motion hearing, the motion was granted and the government subsequently moved to set aside the court's order. *Id.* In analyzing the issue, the *Campbell* court attempted to reconcile 11 U.S.C. § 506 with 26 U.S.C. § 6325(a)(1). Finding that a contradiction arises because Section 506 provides that "an allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim," whereas Section 6325(a)(1) provides that the tax lien shall remain and shall not be released until the obligation of the taxpayer is paid in full or became unenforceable. *Id.* Further, Section 506(d) provides, "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void ..."

Chief Judge Paskay considered the government's concerns that although there was no existing property to which the lien could attach, if the Chapter 13 plan were to abort and be dismissed the debtor might encumber the estate by granting liens to parties who would then not be on notice of the federal tax liens. *Id.* at 201. Finding the government's fears too remote, and following the "Congressional mandate that the provisions of Chapter 13 shall be construed liberally in favor of Debtors who are making a sincere effort to repay their debts either in full, or, at least, in part," the court reaffirmed its order compelling the government to release the federal tax lien. *Id.* at 201–02.

The government appealed to the district court which issued a terse affirmance holding that the "lien must be voided as to the unsecured claim" pursuant to Section 506(d) *Internal Revenue Service v. Campbell*, 180 B.R. 686, 687 (M.D.Fla.1995).

Although the case at bar and *Campbell* are facially similar, the factual discrepancies and the overwhelming body of opposing precedent dictate divergent results. In *Campbell*, the IRS was not asserting a claim against remaining property of the debtor, rather, its sole concern was protecting its lien in the event the reorganization plan failed. There were no other assets to potentially attach. This limitation of *Campbell* is further buttressed by Chief Judge Paskay's decision some three years later in *Aylward*. Therein, Judge Paskay granted the government's summary judgment motion dismissing debtor's claim that a discharge in bankruptcy extinguished an IRS tax lien on the debtor's property. 208 B.R. at 568. Moreover, as indicated *supra*, the Second Circuit does not consider property fraudulently conveyed property of the estate until a judicial determination has been rendered to that effect. If the Government's fraudulent conveyance argument is upheld, the property will now be subject to the federal tax lien, notwithstanding the bankruptcy's discharge of the parents' personal liability. *See Johnson*, 501 U.S. at 84, 111 S.Ct. at 2154.

There is an opposing body of caselaw standing for the general proposition that a debtor is entitled to a release of a lien after paying off the secured portion of a creditor's claim pursuant to a reorganization plan. *See, e.g., In re Johnson*, 213 B.R. 552, 558 (Bankr. N.D.Ill.1997) (finding that a Chapter 13 plan

may require an undersecured creditor to release its lien on a debtor's personal property after full payment of its allowed secured claim); *In re Nicewonger*, 192 B.R. 886, 889 (Bankr.N.D.Ohio 1996) (finding that the holder of a secured claim can be required to release its lien upon receiving payment through the chapter 13 plan of the value of its interest in estate property that is not surrendered); *In re Jones*, 152 B.R. 155 (Bankr.E.D.Mich.1993) (holding that a debtor cannot require an undersecured creditor to release its lien until debtors have made all payments under the chapter 13 plan); *In re Murry–Hudson*, 147 B.R. 960 (Bankr. N.D.Cal.1992) (holding that debtor can require an undersecured creditor to release its lien while Chapter 13 still pending). These cases typically apply the "cram down" provisions of Section 1325(a) as a method of lien avoidance to confirm the plan. Another case, *In re Butler*, allowed a Chapter 13 debtor to avoid a tax lien to the extent that the tax claim exceeded the value of the debtor's property. 139 B.R. 258, 259 (Bankr.E.D.Okl. 1992). That holding was predicated upon a rejection of the application of *Dewsnup* to Chapter 13 cases.

However, the case at bar is not a characteristic "lien-stripping" case in which the value of the collateralized property is determined at the bankruptcy proceeding and the lien is stripped as the debtor pays the value of the collateral securing the undersecured creditor's claim and the lien is released. The property at issue was never before the bankruptcy court.

What is the effect, if any, of the Government's failure to address the parents' interest in the property during the confirmation proceeding. This issue has indirectly arisen in the context of a creditor's knowledge of the debtor's fraudulently prepared bankruptcy plan, and the courts have regularly held that the creditor cannot sit back and wait till after confirmation before attempting to revoke the confirmation order. *See, e.g., In re Ritacco*, 210 B.R. 595, 598 (Bankr.D.Or.1997) (recognizing the distinctions between Sections 1329(a) and 1328(e), notwithstanding, the court held that only when discovery of the fraud occurs after confirmation can the

motion for revocation be brought by creditors); *In re Kouterick*, 161 B.R. 755, 760 (Bankr.D.N.J.1993) ("Where a creditor knows of a basis for challenging confirmation and fails to object, the creditor cannot be permitted to use that basis to claim fraud under Code § 1330 after confirmation."). However, the IRS is not challenging the confirmation or seeking its revocation. *Cf. Young v. Internal Revenue Serv.*, 132 B.R. 395, 397 (S.D.Ind.1990) (holding error in classification of priority claim was insufficient ground for reconsideration of confirmation order).

In light of the overwhelming precedent permitting a federal tax lien to survive a discharge in bankruptcy, the Court is obliged to grant Plaintiff's motion for summary judgment based on the lien theory of recovery.

## IV. FRAUDULENT CONVEYANCE CLAIM

Plaintiff also avers a claim based on the premise that an intervening bankruptcy cannot perfect a fraudulent conveyance. Plaintiff moves to set aside the conveyance of the property pursuant to Sections 273 and 276 of the New York State Debtors and Creditors Law. Plaintiff turns to state law because the validity of the conveyance is governed by New York law. *See United States v. McCombs*, 30 F.3d 310, 323 (2d Cir.1994) (citing *Aquilino v. United States*, 363 U.S. 509, 512–13, 80 S.Ct. 1277, 1279, 4 L.Ed.2d 1365 (1960) ("federal ... courts must look to state law" to ascertain whether a taxpayer has a property interest in property subjected to a federal tax lien)); *see also Rodgers*, 461 U.S. at 683, 103 S.Ct. at 2137 ("It has long been an axiom of our tax collection scheme that, although the definition of underlying property interests is left to state law, the consequences that attach to those interests is a matter of federal law.").

In determining the merits of Plaintiff's motion, it must be determined whether the parents' conveyance to the Defendants was fraudulent. This is so because "the lien imposed by section 6321 shall not be valid as against any purchaser ... until notice ... has been filed by the Secretary," 26 U.S.C. § 6323(a), and it is undisputed that the IRS

did not file a lien before the parents conveyed the property to the Defendants as the tax lien arose in or about September and October of 1986, and the property was conveyed on or about October 17, 1983. Therefore, the Government must prove either that the Defendants are not "purchasers" within the meaning of the code or that the conveyance was fraudulent and must be set aside, or else, the IRS is without a claim against the property. *See McCombs*, 30 F.3d at 322 (finding absent a set aside of the pre-assessment conveyance under state law, the taxpayer did not have a legal interest in the property at the time the tax lien attached).

1. **Fraudulent Conveyance Pursuant to Section 273**

■■ Section 273 states, in relevant part: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regards to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y.Debt. & Cred.Law § 273. This section has been interpreted to cover constructive fraud. *See e.g., Elgin Sweeper Co. v. Melson Inc.*, 884 F.Supp. 641, 649 (N.D.N.Y.1995) (holding that under New York law, plaintiff can recover for fraudulent conveyance without directly proving intent, by establishing "constructive fraud," which can be proven merely by showing that the transfer was made without fair consideration, thus it constitutes a fraudulent conveyance regardless of transferor's intent).

Therefore, to establish a fraudulent conveyance under this section, the Government must prove that: (1) the property was conveyed from Nicholas J. Alfano and Rita Alfano to Nicholas A. Alfano and Lisa Marie Alfano; (2) Nicholas and Rita were or would become insolvent at the time of the conveyance, and (3) the conveyance was made without fair consideration. There is no dispute that the property was so conveyed and the first element is established.

Insolvency, the second element, is defined in Section 271, and a person is deemed insolvent when:

The present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

N.Y.Debt. & Cred.Law § 271. The parents as much as admit their insolvency at the time of the conveyance. During Nicholas J. Alfano's deposition testimony the following pertinent examination occurred:

Q. Back in 1983, what assets did you own?

A. I didn't have any assets. You mean before I transferred the home?

Q. At the time of the transfer. We know about the house, that it was in yours and your wife's name before and your children's name after the transfer. Correct?

A. You mean did I have any stocks, bonds, things like that?

Q. Anything.

A. No.

Q. Did you own any other property?

A. No.

Q. Did you have any cars?

A. I have cars, yes.

Q. Did you have cars in 1983?

A. Yes.

Q. Were those cars in your name or your children's?

A. My name.

Q. At some point did you transfer the title to one of the cars to Lisa?

A. No.

Q. Do you have a guess as to how much the cars would have been worth at the time?

A. Couple thousand.

Q. Total?

A. Probably.

Q. More than five or less than five thousand dollars?

A. Probably less than five.

Q. Is it likely that you had savings at that time?

A. I don't know. I don't recall having a savings account.

Q. Any other types of bank accounts, checking account or anything like that, savings and loan or savings bank?

A. No. No.

Q. Money market, mutual fund, anything like that?

A. No, I never had any of that.

Q. No other real property anywhere?

A. No.

Q. No vacation homes?

A. No.

Q. Do you understand now that you owed the IRS taxes back then?

A. Oh, I understand it now, yes.

Q. Did you have more in assets then than you owed to the IRS in taxes?

A. Then?

Q. Right.

A. No.

(N.J. Alfano's Dep. at 46–49.) Rita Alfano's deposition testimony is consistent with Nicholas J. Alfano's, she recollects having less than $1,000.00 in the bank, and furnishings and jewelry worth less than an additional $1,000.00 each. At the time of the transfer, the parents owed approximately $22,181.00 in income taxes for 1980 and 1981.

■ Moreover, the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee. *See Snyder v. United States*, No. 88–CV–2136, 1995 WL 724529, at *10 (E.D.N.Y.1995). As discussed below, fair consideration was not provided in exchange for the property. Accordingly, for all the aforementioned reasons, the element of insolvency has been established.

With respect to the element of fair consideration, the Debtor and Creditor law definition is found in Section 272, which provides:

Fair consideration is given for the property, or obligation,

(a) When in exchange for such property, or obligation, as a fair equivalent thereof, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation, is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y.Debt. & Cred.Law § 272.

■ Courts view intrafamily transfers made without any signs of tangible consideration as presumptively fraudulent. Thus, in *McCombs*, the court found that "shifting the burden of persuasion to an intrafamily transferee is triggered under New York law by the presence of one of two factors in the conveyance: (1) the absence of any tangible consideration, or (2) a clandestine transfer of property designed to conceal the nature and value of the consideration." 30 F.3d at 325. In the case at bar there is no allegation that the transfer was effectuated in a clandestine manner. Rather, the conveyance was recorded in accordance with the laws of the State of New York. However, the deposition testimony of the parents and the deed recording the transfer support the conclusion that there was no tangible consideration given. The following deposition testimony of Nicholas J. Alfano is telling:

Q. First, what did your children pay for the house, if anything?

A. I don't believe there was any payment.

(N.J. Alfano's Dep. at 29.) Nor was the transfer payment for an antecedent debt.

Q. Did your son or your—did you or your wife owe your son or daughter money at the time of the transfer?

A. No.

Q. Was there anything that they gave you of any value in exchange for this transfer; that is, the transfer of the house to your kids?

A. I don't remember. I don't remember.

Q. Would you look at Exhibit 1? At the top left is says "zero consideration." Do you see that?

A. Yes.

Q. And a little bit lower, in the middle it says "witnesseth that the party for the

first part, in consideration of $10 and other valuable consideration," and goes on from there. Do you see that?

A. Yes.

Q. Do you have anything that would lead you to believe that anything more than zero or $10 was paid for that house by your children?

A. I guess not.

Q. Let me be clear with you. There may be a trial in this case, When we go to trial and I ask you what has been paid for the house, are you going to say "zero" or is there going to be something else?

A. We just transferred the house to the children for the reasons I gave.

Q. It wasn't a business deal of any sort?

A. No.

Q. And it wasn't a sale?

A. No.

Q. It was a gift?

A. I guess so.

(N.J. Alfano's Dep. at 31–33.) Although the parents provided a explanation for the conveyance which does not suggest a motivation to evade tax liability, a showing of actual fraudulent intent is specifically not required by the statutory language of Section 273.

Q. Whose idea was it to transfer the property?

A. Both me and my wife.

Q. Why?

A. We were having marriage problems and we were talking about Divorce.

Q. And so?

A. We decided to give the house to the children so that they would have a roof over their heads. We didn't want to—we didn't want it to go to court, and that is what we did.

(N.J. Alfano's Dep. at 12.) However, although the conveyance satisfied the formal legal requisites, the parents still treated the property as their own for tax purposes.

Q. Did you make the payments for real estate taxes and mortgage?

A. I don't remember.

Q. Did your wife?

A. I don't know.

Q. What about for 1985? Were you living in the house?

A. I don't remember—was I living in the house?

Q. Right.

A. I think I had come back sometime in '85. I don't remember when.

Q. Were you making—were you paying the real estate taxes for the house that year, 1985?

A. I don't know. I don't remember. I believe my son was, but I don't know.

Q. What about the mortgage payments?

A. I don't know if there were any.

Q. I would like to show you what has been marked Exhibit Number 5. At the top of the form it says "1040 U.S. Individual Tax Return, 1984," and has the names Nicholas and Rita Alfano. Do you see that?

A. Yes.

Q. Is this your 1984 tax return?

A. Yes.

Q. Did you own any real estate in 1984?

A. No.

Q. Do you see where it says "real estate taxes"?

A. Yes.

Q. It says that $1,442 were paid in real estate taxes in 1984. Do you see that?

A. Yes.

Q. Is that the amount of real estate tax that you paid for that year?

A. I don't remember.

Q. Could you look at line 11.... It says $672 in home mortgage interest was paid that year. Do you see that?

A. Yes.

Q. Did you pay that amount for home mortgage?

A. I don't know. I don't remember.

Q. Was there any other home mortgage that you might have been paying in

1984 other than the house on Alden Lane?

A. No.

Q. Was there any other property you would be paying real estate taxes on in 1984 other than the house on Alden Lane?

A. No.

Q. So when you filed this tax return, you honestly thought that you paid a home mortgage interest of $672 and real estate taxes of $1,442?

A. I don't know. I guess so. I don't know.

(N.J. Alfano's Dep. at 36–40.) A similar inquiry pertaining to his 1985 tax return took place, culminating in the following inquiry:

Q. I would like you to look at page 3 of that return, Schedule A, at line 7. Do you see where it says that you paid $1,542 in real estate taxes?

A. Yes.

Q. Do you know what property that was on?

A. 11 Alden Lane, I guess.

Q. The house that you transferred to your children?

A. Yes.

Q. And on that same page, line 11, where it says home mortgage interest you paid to financial institutions, it says $657. Do you see that?

A. Yes.

Q. For which home was that interest paid?

A. On the 11 Alden Lane.

(N.J. Alfano's Dep. at 41.) The parents testified that they paid rent to the transferees, Defendants herein, who paid all of the bills including the underlying mortgage and real estate taxes, however, this was done in an informal manner.

Q. Did your son formally take on the mortgage of the house after the transfer?

A. What do you mean formally?

Q. Did you sign any papers so that you were off the mortgage and he was on it?

A. No.

Q. Other than fill out a deed, which we showed you earlier as Exhibit 1, were there any other documents created in connection with the transfer of the house to your children?

A. No.

Q. So there is nothing that would show that your children took on the mortgage on 11 Alden Lane.

A. No.

Q. Did your children assume the mortgage?

A. You mean legally?

Q. Yes.

A. No.

(N.J. Alfano's Dep. at 44–45.) Assumption of mortgage debt may constitute fair consideration, where, for example, the debt assumed nearly approaches the relative value of the property, *See McCombs*, 30 F.3d at 326, or where the conveyance satisfied an antecedent debt. *See In re Fair*, 142 B.R. 628, 631 (Bankr.E.D.N.Y.1992) (although the deed indicated that the property was conveyed for "no consideration," the prior divorce decree indicated that the wife agreed to make no claim for maintenance in consideration of her husband signing over his interest in the property to their daughter, and this amounted to fair consideration). However, where the property was taken subject to the mortgage, or where transferors received nothing for their equity, fair consideration was not given. *See, e.g., McCombs*, 30 F.3d at 327 (vacating district court's decision, in part, because purchasers did assume mortgage and did not just take property subject to the mortgage); *In re Davis*, 169 B.R. 285, 300 (E.D.N.Y. 1994) (finding a fraudulent conveyance because debtors received nothing for their equity in the house and therefore did not receive fair consideration, notwithstanding fact that mortgage and mortgage arrears were paid off).

In the instant action, the evidence supports a singular conclusion; the property was not

transferred for fair consideration. A conservative estimate of the value of the property at the time of the conveyance was approximately $50,000.00. The IRS and Nicholas J. Alfano so estimated. (Pl.'s 56.1 ¶ 15.) The Defendants made application for a loan approximately two years later and valued the property at $140,000.00. (Pl.'s 56.1 ¶ 15.) The pre-existing mortgage had a face value of $15,000.00, and an outstanding balance of $9,100.00 at the time of the aforementioned loan application, and the Defendants did not assume the mortgage. (Pl.'s 56.1 ¶ 15.)

Although some courts have considered the issue of fair consideration inappropriate for summary adjudication, see *United States v. Sitka*, No. 2:90CV00268, 1994 WL 389473, at *6, 7 (D.Conn.1994), it is an available remedy, readily employed. See, e.g. *Snyder*, 1995 WL 724529, at *12 (granting summary judgment on government's fraudulent conveyance claim); *U.S. v. Bushlow*, 832 F.Supp. 574, 581–82, (E.D.N.Y.1993) (holding that sufficient evidence established that taxpayers' transfer of their house to their son was fraudulent under New York law, and could be set aside in an action by the United States to collect income taxes owed, where the language of the instrument of transfer indicated that the consideration was "ten dollars and other valuable consideration," and the taxpayers' joint liability exceeded $200,000 at the time of the transfer); *United States v. Nirelli*, No. 92–CV–563C, 1997 WL 718443, at *5 (W.D.N.Y.1997) (finding no record of release of antecedent support payments serving as consideration for transfer of residence from husband to wife and granting government's motion to set aside the conveyance).

In the instant action, Defendants' have failed to challenge the Government's fraudulent conveyance claim. As indicated above, and according to the deed, the parents conveyed the property to the Defendants for ten dollars, and although the Defendants agreed to make the monthly payments, they did not assume the existing mortgage. Additionally, the facts show that the parents were rendered insolvent by this transfer.

Accordingly, the Court holds that Defendants have presented no credible evidence to meet their burden of proving that the property was conveyed for "fair consideration" as defined under prevailing New York State law. Summary adjudication is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Therefore, the Court finds that the transfer from Nicholas J. Alfano and Rita Alfano to Nicholas A. Alfano and Lisa Alfano of the property located at 11 Alden Lane, Centereach, New York, was a fraudulent conveyance as defined by Section 273 of the Debtor and Creditor Law of New York.

2. Fraudulent Conveyance Pursuant to Section 276

 The Government also moves to set aside the transfer pursuant to Section 276 of the New York State Debtors and Creditors Law. Section 276 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y.Debt. & Cred.Law § 276. As explained by the Second Circuit, "unlike section 273 which creates constructive fraud by virtue of the lack of fair consideration, section 276 focuses on the 'actual intent' of the transacting parties. Indeed, where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of the consideration given." *McCombs*, 30 F.3d at 327–28. However, intent can be inferentially proven. See *In re Montclair Homes*, 200 B.R. 84, 97 (Bankr.E.D.N.Y. 1996) (finding that intent does not need to be shown by direct evidence, and is normally inferred from the circumstances surrounding the transfer). Still, actual intent to defraud must be proven by the party seeking to set aside the conveyance by clear and convincing evidence. *McCombs*, 30 F.3d at 328 (citing *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (1986) & *ACLI Gov't Securities v. Rhoades*, 653 F.Supp. 1388, 1394 (S.D.N.Y.1987)).

■ Factors utilized by courts to circumstantially infer actual intent—which have been termed "badges of fraud"—include: (1) whether the consideration received was adequate or existent at all; (2) whether the transferee was a relative; (3) whether the debtor retained possession; and (4) whether the debtor's financial condition change after the transfer. *In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir.1983). More recently the Second Circuit noted that the " 'fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions.' " *McCombs,* 30 F.3d at 328 (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir.1984)). Although a strong argument could be made to support the conclusion that these factors have been established herein, because the parents proffered a plausible non-fraudulent explanation for the conveyance—namely, to ensure that their children, the Defendants, would have a home impervious to the vagaries of divorce proceedings—their intent becomes a factual issue unsuited for summary adjudication. *See United States v. Digiulio,* No. 95–CV–219S, 1997 WL 834820, at *11 (W.D.N.Y.1997) (denying fraudulent conveyance claim because evidence did not convince the court that the transfer qualified as an "exception to the well-established rule that summary judgment is normally inappropriate when deciding questions of intent").

Accordingly, because Plaintiff has establish a fraudulent conveyance claim pursuant to Section 273, the Court need not decide at trial whether Plaintiff can establish a fraudulent conveyance claim pursuant to Section 276.

### 3. Defendants Are Not Purchasers Excepted From the Lien

■ Although not raised by the Government, if the Defendants are not bona fide purchasers of the subject property, they are not entitled to protection from the lien. The IRS code specifically provides that a federal tax lien "shall not be valid against any purchaser, holder of a security interest, mechan-

ic's lienor, or judgment lien creditor[s]" unless notice of that lien has been properly filed. *See* 26 U.S.C. § 6323(a). A purchaser is defined therein as "a person who, for adequate and full consideration in money or money's worth, acquires an interest in property...." *See* 26 U.S.C. § 6323(h)(6). As described above, the evidence shows that the Defendants did not give adequate and full consideration for the property, and are therefore not entitled to statutory protection as purchasers. *See United States v. O'Day,* No. 95–86–CIV–ORL–18, 1996 WL 814496, at *5 (M.D.Fla.1996). In *O'Day,* as in the instant action, the government sought to foreclose on federal tax liens and to set aside a conveyance of real property. The taxpayer conveyed his property to his sons for no consideration and later voluntarily filed for Chapter 7 bankruptcy protection. *Id.* at *3. The court granted the government's summary judgment motion, holding that the federal tax liens survived bankruptcy and the sons were not purchasers under § 6323(a). *Id.* at *5. The court also concluded that property was fraudulently conveyed. *Id.*

Defense counsel's failure to address the Government's tax lien and fraudulent conveyance analyses reflects either an acknowledgment of the perceived futility of Defendants' position, or abject inept advocacy, nonetheless, for all the aforementioned reasons, Plaintiff's motion for summary judgment is granted with respect to its claim pursuant to the lien theory and with respect to the fraudulent conveyance theory pursuant to Section 273.

### V. PLAINTIFF'S MOTION FOR ATTORNEYS' FEES

Plaintiff also moves for attorneys fees pursuant to New York Debtor and Creditor Law § 276–a, which provides in relevant part:

> In an action or special proceeding brought by a creditor ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor

... shall recover judgment, the justice ... presiding at the trial shall fix the reasonable attorney's fees of the creditor ... in such action....

N.Y.Debt. & Cred.Law § 276–a. However, because the Court has found genuine issues of material fact respecting the parents intent, actual fraud cannot be established by summary adjudication, and accordingly, Plaintiff's motion for costs is hereby denied.

## VI. ENFORCEMENT OF THIS ORDER

Having determined that the parents' tax liability, although personally discharged in bankruptcy, remains as a valid tax lien against the property at issue, which was fraudulently conveyed to the Defendants, the Court must determine the proper resolution of this action. Clearly, pursuant to 26 U.S.C. § 7403, the Court may decree a sale of such property and distribute the proceeds in respect to the interests of the parties and the United States, however, because "financial compensation may not always be a completely adequate substitute for a roof over one's head," *Rodgers,* 461 U.S. at 703, 103 S.Ct. at 2148, it would be preferable if the parties could reach an agreement resolving this action without requiring the forced sale of the property. Although *Rodgers* has provided guidelines for a court to consider when weighing the interests of third parties before authorizing a forced sale, *id.* at 709–11, 103 S.Ct. at 2151–52, analysis thereof is not presently necessary. Accordingly, a settlement conference will be scheduled by the Court.

## CONCLUSION

Accordingly, for all the aforementioned reasons, Defendants' motion for summary judgment is denied in its entirety and Plaintiff's motion for summary judgment is granted to the extent provided in this Memorandum and Order. Plaintiff's motion for attorneys' fees is denied.

Plaintiff's enforcement of this Memorandum and Order is stayed until further instructions of the Court.

SO ORDERED.